Marian NUNNALLY, Appellant,

v.

J. Fletcher WILDER et al., Appellees.

Marian NUNNALLY, Appellant,

v.

J. Fletcher WILDER, Appellee.

Nos. 17848, 17849.

United States Court of Appeals
District of Columblia Circuit.

Argued Jan. 17, 1964.

Decided March 5, 1964.

Mr. Joseph B. Calandriello, Washington, D. C., with whom Messrs. LeRoy Pumphrey and Edgar B. May, Washington, D. C., were on the brief, for appellant.

Mr. Charles H. Quimby, Washington, D. C., for appellees.

Before FAHY, BASTIAN and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge.

These appeals present a tangled fact situation growing out of the activities of two individuals who joined forces to carry on a restaurant business. The confusion is due largely to imprecision and informality in the arrangements governing the creation and operation of this common enterprise. Further complicating the matter, a corporate form was ultimately employed, but without adequate differentiation between the separate corporate entity and the individual interests of the two people whose instrumentality it was. A final blow to the cause of clarity was the death of one of the principals and his consequent unavailability to help in reconstructing the scene.

The cases come to us after a lengthy trial on the merits, and upon a judgment based upon comprehensive findings of fact and conclusions of law by the judge who tried it without a jury. For reasons set forth below we find no occasion to disturb the lower court's action in No. 17,848. However, No. 17,849 must be reversed and remanded.

I

Mr. J. Wilmer Morris, for many years prior to his death on November 15, 1955, was engaged primarily in the business of purveying seafood at both wholesale and retail. His primary instrumentality was a wholly-owned corporation known as New England Seafood Company, which was a food brokerage operation. From time to time and for varying periods over the years Morris would initiate and operate related businesses, primarily restaurants, although one such enterprise was another food brokerage operation carried on for a time around 1952–53 in the form of a wholly-owned corporation called Morris & Moreci, Inc.

Late in 1953 Morris decided to launch a new restaurant, to be built on property owned by him at 4510 East Capitol Street in the District of Columbia and to be called the Shrimp Boat. Feeling the need of a younger and more active man to function full-time on the premises, Morris, between January and March of 1954, initiated conversations with Mr. J. Fletcher Wilder, then working as a food buyer for another employer. These talks resulted in an understanding that Wilder would leave his job, where he had been for many years with earnings of from $8,000 to $11,000 per year, and become a partner of Morris in the operation of the Shrimp Boat. The understanding contemplated that Wilder would receive a salary of $150 per week, and that Morris would give him a 45 per cent interest, both in the business itself and in the realty and improvements at 4510 East Capitol Street.

Operations began on April 1, 1954. In the following July, Morris, upon the advice of his accountants and without consulting Wilder, decided for tax reasons to utilize the corporate shell of Morris & Moreci, Inc., for the operation of the Shrimp Boat. Accordingly, the assets and liabilities were set up on the books of that corporation, Morris transferred 45 per cent of his stock to Wilder, and Wilder was elected president —all without Wilder's prior knowledge. Upon being advised of these developments, however, Wilder concurred.

A rough division of effort between Morris and Wilder in the operation of the Shrimp Boat appears to have existed. Wilder served as a local manager, being on the premises virtually all of the time during business hours, hiring waitresses, kitchen help and like personnel, and on occasion acting himself as cook and counterman. Morris functioned at a different managerial level: He would visit the premises daily, take the receipts to the bank for deposit, buy the food and other supplies, and hire some personnel,

such as cashiers and a night manager. The bookkeeper was a Morris employee, and Morris approved all bills for payment. Morris' accounting firm made up monthly audits of the operation, which were examined only by Morris.

In the months just prior to April 1, 1955, Morris felt some financial strain and decided to put the Shrimp Boat up for sale. After approaching several potential buyers without eliciting an offer, he at length asked Wilder if the latter would like to buy Morris' interest. The business had not prospered up to that point, there being then a net worth deficit of $5,000 and virtually no cash. Morris told Wilder that his basic need was for $30,000 in cash. The upshot of this approach to Wilder by Morris was a deal whereby Morris' 55 per cent stock interest in Morris & Moreci, Inc., together with his interest in three parcels of realty,[1] would be sold for $30,000 in cash, plus a note for $30,000 secured by a trust deed on the realty. In the case of the note, however, the understanding was that, if Morris predeceased Wilder, the then outstanding balance of the note should be deemed to have been paid; and an express provision to this effect was incorporated in both the note and the trust deed.[2] Wilder exerted himself, mainly by extensive borrowings, to raise the $30,000 cash payment; and settlement of the agreement was effected on April 20, 1955.

Two other financial items are involved in the litigation and require identification. Prior to enlisting Wilder in the Shrimp Boat venture, Morris had borrowed $11,500 from the National Bank of Washington, giving a note in that amount dated February 1, 1954. Morris & Moreci, Inc., when it took over the Shrimp Boat operation, assumed the payment of this note, and thereafter did make payments on it. When the note had been reduced to $8,000, it appears that a renewal note was given by Morris as maker, with successive endorsements by Wilder and Morris. One subsequent payment was made on this note by Morris & Moreci, Inc., and one by Wilder, so that, on December 28, 1956, the unpaid balance was $7,074.86. On that date the National Bank of Washington, as executor of Morris' estate, paid the note with funds of the estate.

The second item consists of an indebtedness of Morris & Moreci, Inc., to New England Seafood Company. This was in the amount of $1,795.98, and represented purchases of food supplies for use in the Shrimp Boat. The National Bank of Washington, first as the collector of Morris' assets and then as his executor, took over the books of New England Seafood Company, and ultimately sold the assets of that company, retaining the accounts receivable. At no time, however, did it take any step to collect this item due from Morris & Moreci, Inc. The first and final account of the executor was filed and approved on April 24, 1959.

On March 24, 1959, the residuary legatees of Morris (a sister and a niece) filed suit, No. 17,848 on appeal, against Wilder and his wife on the $30,000 note. On June 1, 1959, they filed a second action, No. 17,849 on appeal, against Wilder to recover the $7,074.86 paid by the Bank as executor in liquidation of the Morris note. In this second action Wilder counter-claimed for the payments made by himself and by Morris & Moreci, Inc., in reduction of the principal of this obligation.

On November 9, 1961, an amended complaint was filed[3] in the first suit

---

1. One of these was the realty at 4510 East Capitol Street, in which Morris had undertaken to give Wilder a half-interest but as to which no formal conveyance of such interest had ever been made. The other two were adjoining lots which Morris and Wilder purchased as joint tenants in July, 1954, to provide parking space. The down payment was made by Wilder.

2. "It is agreed that in the event J. Wilmer Morris shall predecease the makers hereof during the existence of the deed of trust securing this note, the unpaid balance hereof shall be considered paid and cancelled."

3. By Morris' niece, who was then the only surviving residuary legatee.

which substantially enlarged its scope. Allegations of inadequacy of consideration and breach of fiduciary relationship were directed against the transaction by which Morris sold his interests to Wilder, and it was asked that this sale be set aside, with an accounting for profits. Only in the event the sale was left undisturbed was the original claim on the $30,000 note pressed. Morris & Moreci, Inc., was added as a defendant and judgment was asked against it for the $7,074.86 and the $1,795.98. The Wilder counter-claim was interposed in this suit also.

It was in this posture of the pleadings that the two cases were tried together. At the conclusion thereof, the District Court entered judgment dismissing the complaints in the two suits and the counter-claim. The latter action has not been appealed.

## II

The central relief sought in the amended complaint is the nullification of the transactions whereby Morris moved to cause Wilder to become sole owner of Morris & Moreci, Inc., and of the real estate involved in the Shrimp Boat operation. It is asserted that the proof shows a gross inadequacy of the consideration paid, and the suggestion is that Morris, because of asserted physical infirmity,[4] was somehow at the mercy of Wilder, who took advantage of this situation in an unconscionable manner to appropriate for himself benefits belonging to both participants in the business.

█ The findings and conclusions of the trial judge are, however, directly to the contrary; and an examination of the record shows ample support therefor. Morris seems to us to have been the moving spirit in both persuading Wilder to come into the venture in the first place and to take over Morris' interest when the latter wished to withdraw from the enterprise. The evidence is clear that Morris followed actively and closely the affairs of the Shrimp Boat during the period of the joint undertaking (and, indeed, until the time of his death); and he was, if anything, far better informed than Wilder about its financial condition and prospects. There is no explicit finding or conclusion by the trial judge on the matter of adequacy of consideration, but we think there need not have been since that claim was not seriously pressed apart from the entwined contention that there was overreaching. In any event, the financial facts as they appear in the evidence do not appear to us to add up to anything like inadequacy of consideration as a matter of law; and we think this is implied in the judge's finding that it was Morris himself who devised and suggested the terms on which the sale was made.

Contrary to the suspicions aired by Morris' residuary legatee, we think the picture that emerges is one of refreshingly deep and justified mutual trust between the partners. Morris was the older man of affairs, with greater experience and knowledge in matters of finance. Wilder was the younger operating manager, with greater stores of physical energy which could usefully be expended in long hours devoted to carrying on the business at the point of contact with the customer. Morris frequently acted at the higher and different level without advance notice to Wilder, but such was the nature of their relationship that Wilder always acquiesced when informed, and there is nothing to indicate that this relationship was other than completely satisfactory to the two men themselves and in their mutual interest. The doubts come later—and from a different quarter.

█ We think, therefore, that the trial court was justified in refusing to roll back the transactions flowing from the sale of Morris' interest to Wilder. We are similarly of the view that there

---

4. Morris had had a coronary attack in 1949, and was considered to have a heart condition thereafter until his death in 1955. But the trial court found that this condition did not impair Morris' mental faculties in any way nor interfere significantly with his conduct of business activies.

was no liability on the $30,000 note. By its explicit terms that note was to lose its vitality if and when Morris predeceased Wilder. The trial court found as a fact that this condition of the note originated with Morris, along with the other terms and conditions of the sale. We think that, in the context of the other findings and the evidence of record, the reasons for this proposal by Morris are perfectly natural. Morris knew, to say the least, that the financial horizons of the venture were overcast at best and that the Shrimp Boat was wallowing in heavy seas. He knew also that Wilder would start his period of sole proprietorship heavily encumbered by the obligations incurred to raise the $30,000 in cash which Morris represented to be his primary goal. Should the gale abate, it was rational for Morris to try to maintain some stake in any future fair weather; the $30,000 note, with its payment to Morris of $300 per month so long as he lived, was clearly adapted to this end.[5] From Wilder's standpoint, the course ahead was hazardous at best, and there was presumably a limit to the risks he could run, close-hauled as the craft already was. A $30,000 note held by Morris alive was one thing; they had been friends and singularly trustful business partners. A $30,000 note in other—and perhaps less understanding —hands would be quite a different thing.

■ It is urged upon us that the condition stated in the note must fail because it is an invalid attempt to make a testamentary disposition contrary to the Statute of Wills (§ 19–103, D.C. Code 1961). But we think, in common with the trial court, that the condition is contractual—not testamentary—in character, and that the formalities of the Statute of Wills have no application. One of the essential elements of the deal—as conceived and volunteered by Morris himself—was the conditional character of this obligation. To give effect now to this unambiguous expression of the agreement of the two men does no harm to the interests served by the Statute of Wills. The sanctity of contractual undertakings has an importance no less than that of the clear demonstration of testamentary intentions. In any event, the two are not the same.

### III

There remain the two items of $7,074.86, and $1,795.98. The central theory of liability asserted as to the former is that, when the National Bank of Washington as executor of Morris' estate, used estate funds to pay to itself as lender the outstanding balance due on the note, a right arose to recover this sum from Morris & Moreci, Inc., which had assumed the obligation represented by the note. This payment was made on December 28, 1956, and the Bank did not finally account as executor until April 24, 1959. The trial judge also found as a fact that the Bank knew that, from May 6, 1954 until Morris' death on November 15, 1955, all payments on the note had been made by checks drawn by Morris & Moreci, Inc., on its account in the Bank; and that, notwithstanding this knowledge, the Bank made no effort to collect for the estate the sum of $7,074.86 from Morris & Moreci, Inc.

The trial court also found as a fact that, although the Bank, after the death of Morris, took over the books of New England Seafood Company, which books showed a debt of Morris & Moreci, Inc., in the amount of $1,795.98, it made no effort either as collector or executor to realize this sum for the estate.

■ The trial court concluded as a matter of law that, in the light of the provisions made by statute for the administration of estates, only the Bank was authorized to sue upon these claims of the estate and that the residuary legatee was without standing. It ruled further that, even if standing be assumed, the claims were barred by the statute of limitations. As regards the first suit, No. 17,848 on appeal, the sec-

5. It seems to have been in the nature of a life-time annuity for Morris who ap- pears to have had no direct lineal descendants about whom to be concerned.

ond ground seems unassailable to us, and we affirm without reference to the issue of standing. The claims are of such a character that the timeliness of their assertion is unquestionably measured by the prescribed statutory period. These issues were put forth for the first time in the amended complaint of November 9, 1961. They constituted completely new matter unconnected with the first complaint, and, therefore, presented new causes of action which could not relate back to the 1959 complaint. Appellant argues that the statute should be disregarded because of concealment or trickery. But the trial court found no such connivance; indeed, its findings are directly to the contrary because it viewed the evidence as showing that the Bank knew of a Morris & Moreci, Inc., relationship to the note, and had records in its possession showing the account receivable due New England Seafood Company from Morris & Moreci, Inc.

However, from the information of record it does not appear that the second 1959 complaint, No. 17,849 on appeal, setting forth the claim against Wilder for $7,074.86, is necessarily so barred. The cause of action alleged against Wilder is said to have arisen as a result of his prior endorsement of the renewal note. The court below concluded that as against the corporation this cause of action began to run when the administrator paid the debt out of the estate, i. e., on December 28, 1956. If this also be true vis-a-vis Wilder, then the three-year statute of limitations provided in 12 D.C.Code, § 201 would not have expired when this suit was commenced June 1, 1959. Thus, in this second suit we may not, based on what appears in the findings below, affirm on the ground that the statute of limitations had run, and must, therefore, face the question of whether the legatee has standing to bring the action. We hold that she does.

██ Appellees contend that a debt owed to the estate of a deceased person can only be collected by the administrator or executor of the estate. This is certainly the general rule. However, in most jurisdictions that have passed upon the question an exception is made when a final accounting has been approved, the estate has been closed, and the administrator discharged. In that situation the residuary legatees, or those otherwise entitled, may sue to collect claims that were left unrecovered when the estate was closed. See Stanley v. Mather, 31 F. 860 (N.D.Ill.1887); Annot. 22 L.R.A. (N. S.) 458 and cases there cited; 21 Am.Jur. Executors & Administrators § 1005. The question appears not to have been passed upon in this jurisdiction.[6] The exception appears to us to state the better rule. The reasons which call for an independent administrator have, for the most part, disappeared by the time the exception comes into play. The creditors have been discovered and satisfied; cost of handling the estate has been determined and paid; and the order of distribution of the residuary estate has been determined and the respective sums paid. There is little danger of a fraud on the estate. Moreover, the expense of appointing a new administrator and his costs and fees can be avoided. In short, there seems to be no good reason why the plaintiff, as the sole existing residuary legatee of the estate, should not be permitted to assert a claim which the Bank as executor could have brought. We therefore reverse and remand No. 17,849 to the District Court to determine the merits of the $7,074.86 claim.[7]

No. 17,848 is affirmed.

No. 17,849 is reversed and remanded.

6. The case of Marfield v. McMurdy, 25 App. D.C. 342 (1905), cited by appellees, did not concern this question.

7. The counter-claim in No. 17,849 was also dismissed by the court below, and no appeal was taken from this action. We are therefore precluded from reinstating it. The grounds for the dismissal are not clearly evident, though it would appear that it resulted from the dismissal of the primary claim. If that was the case, and a proper motion is presented, the lower court may wish to give consideration to reinstating the counter-claim under Rule 60(b) (5), Federal Rules of Civil Procedure. We do not, of course, intimate any view on the merits of either the main claim or the counter-claim.